**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNIQUE PAVING MATERIALS** | ) | **CASE NO. 07 CV 2501** |
| **CORP.,** *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **ANTHONY FARGNOLI,** *et al.*, | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| **Defendants.** | ) | |

**<u>INTRODUCTION</u>**

This matter is before the Court upon defendants' Motion for Summary Judgment (Doc. 23) and plaintiffs' Motion for Leave to file a Surreply (Doc. 37). This case arises out of defendant Anthony Fargnoli's employment with defendant Lafarge North America Inc. For the reasons that follow, defendants' Motion for Summary Judgment is GRANTED and plaintiffs' Motion for Leave is DENIED.

**<u>FACTS</u>**

Plaintiffs Unique Paving Materials Corp. and Unique Paving Materials of California, Inc. (collectively, "Unique") bring this action against defendants Anthony J. Fargnoli, Don Nathan, Lloyd Folsom and Lafarge North America Inc. ("Lafarge"). Unique and the QPR division of Lafarge both make and sell "cold patch" paving repair material.

**A.     The Parties' Products and Business Models**

Unique's cold patch is comprised of stone (sometimes referred to as "aggregate"), diesel oil, asphalt and an anti-stripping additive. Unique discloses these ingredients to its

customers and the public.  Unique also discloses the quantity of each ingredient in its cold

patch.  Only the formula for the anti-stripping additive is kept confidential.  Fargnoli does not

know and has never known the formula.

Plaintiffs manufacture most of their cold patch with the help of asphalt suppliers,

called "producers."  The producer supplies the aggregate.  Unique supplies a mixture of the

other three ingredients.  The combination of these three ingredients is referred to as the "oil."

Before the producer combines its aggregate with plaintiffs' oil, plaintiffs test the aggregate to

ensure it has the proper qualities and characteristics.  Unique does not keep the identity of its

producers confidential.  H&K Group is one such producer used by Unique.  This fact was

made known via a widespread mailing to Unique's customers in Pennsylvania.  Other

producers, including Eastern Industries and Paving Maintenance Supply, are identified on

Unique's website.

Defendant Lafarge uses producers to a lesser extent.  When it does use producers,

Lafarge outsources the quality control testing of the aggregate to a company named

MeadWestvaco.  The tests used by MeadWestvaco to ensure the quality of the aggregate

being added to Lafarge's oil were in place before Fargnoli joined Lafarge.  MeadWestvaco

also happens to be the supplier of the anti-stripping agent used by Lafarge.  The formula for

Lafarge's anti-stripping additive has been in use for more than 15 years.

The process of mixing together the aggregate with the oil varies with each batch.  The

goal is to obtain the proper viscosity so that the cold patch may be effectively applied to the

road surface given the prevailing weather conditions.  The person charged with quality

control determines the amount of oil and aggregate to be used and adjusts these amounts until

the proper viscosity is obtained.  Variations in mixing speed and temperature also affect the final viscosity of the cold patch product.  The mix protocol used by Lafarge was in place before Fargnoli joined the company and has been displayed on Lafarge's website for more than three years.

**B.      Fargnoli's Employment History**

In 1992, Fargnoli began working for TCG Materials, Inc., a predecessor to the QPR division of defendant Lafarge.  He was employed to sell TCG's cold patch pavement repair material, which was then known as "QPR 2000."  He was eventually promoted to Sales, Marketing and Technical Manager for the United States and Canada.  In this position, Fargnoli was responsible for selling, production and quality control.  He thus became intimately familiar with the QPR 2000 product, its ingredients, its production and the tests and processes used to ensure a quality product.  In 2000, Blue Circle Aggregates purchased the QPR 2000 business from TCG.  Fargnoli worked for Blue Circle until October, 2000.  In January 2001, Fargnoli went to work for Kwik-Mix, a cold patch distributor.

In May 2001, Fargnoli joined Unique as a sales representative in New York and western Pennsylvania.  Ohio was not part of Fargnoli's assigned territory; however, Fargnoli did help Unique to establish a relationship with a service provider in Ohio, PLM, that was retained to bag Unique's cold patch product.  As a sales representative at Unique, Fargnoli was responsible for sales, production and quality control - the same functions he had performed at TCG and Blue Circle.  When Fargnoli joined Unique, he identified for them the customers he called on while at TCG.  One of those customers was Albany Asphalt located in New York.  Another was a predecessor-in-interest to what is now known as H&K in

Pennsylvania.

When Fargnoli commenced his employment with Unique, he signed a Confidentiality,

Patent and Non-Competition Agreement (the "Employment Agreement" or "Agreement").

The Employment Agreement states in pertinent part:

> 4.  Confidentiality.  I will not, either during my Employment
> or thereafter, except as authorized or directed by Company in
> writing, disclose to others, use for my own benefit, copy, or make
> notes of, any confidential knowledge, proprietary methods or
> information, or trade secrets or any other knowledge or
> information (other than that which is public knowledge) of or
> relating to the business, activities, formulations or facilities of
> Company which may come to my knowledge during my
> Employment.
>
> ***
>
> 6.  Non-Competition.  Upon termination of my Employment
> for whatever reason and irrespective of whether said termination
> constitutes wrongful discharge or is voluntary on my part or not,
> I covenant and agree that for a period of three (3) years following
> said termination, I shall not, directly or indirectly, enter into direct
> competition with Company in the business of developing,
> producing, distributing and/or selling asphalt patching materials
> in the State of Ohio and the State of [fill in the blank] New York,
> which is my assigned territory as an Employee of Company.  I
> agree not to enter into direct or indirect competition as described
> herein, either as a principal, shareholder, partner, joint venturer,
> investor, option holder, lender, financier, consultant, advisor,
> director, officer, salesperson, employee or agent for or with
> respect to individual or business enterprise in any form
> whatsoever.  ...  I specifically agree that these non-competition
> restrictions are no greater than those required for Company's
> protection; that they do not impose undue hardship on me; and are
> not injurious to the public.
>
> ***
>
> 10.  Modification.  This Agreement cannot be amended,
> changed, modified or discharged except by an agreement in
> writing signed by both the Company and me.

In 2005, Don Nathan - the sales manager at Lafarge - recruited Fargnoli to join them

as a sales representative in the mid-Atlantic region.  Fargnoli declined because of the non-

4

compete provision contained in the Employment Agreement (the "non-compete").  By 2007, Nathan had become responsible for quality control at Lafarge and he was looking to hire a new quality control manager.  By then, Fargnoli had also grown unhappy with his role at Unique.  He did not receive a bonus in 2006 and his territory was expanded with no increase in pay.  He called Lloyd Folsom at Lafarge and asked for a job.

In 2007, Fargnoli left the employ of Unique and began working for Lafarge in a quality control capacity.  In this capacity, Fargnoli works with customers to ensure Lafarge's cold patch meets all of the customer's specifications.  He states that he is not involved in sales but does have contact with customers in connection with his quality control duties.  He also has input into customer pricing, because he is the person with knowledge of Lafarge's raw materials costs.

Plaintiffs' First Amended Complaint sets forth six causes of action.  Count One seeks injunctive relief restraining defendants from using plaintiffs' trade secrets.  Count Two seeks contract damages and an accounting from Fargnoli.  Count Three alleges conversion, misappropriation of trade secrets, tortious interference and unfair competition against all defendants.  Count Four alleges that defendants violated Ohio's trade secret act, Ohio Rev. Code § 1333.61, *et seq.*  Count Five asserts breach of contract by Fargnoli.  Count Six alleges tortious inducement of breach of contract by Folsom, Nathan and Lafarge.

Defendants now move for summary judgment on all counts.  Plaintiffs move for leave to file a surreply.  Each motion is opposed.

### **STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and

the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477

U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. United*

*Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence

of any such genuine issues of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings,
> depositions, answers to interrogatories, and admissions on file,
> together with the affidavits, if any," which it believes demonstrate
> the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).  A fact is material only if its

resolution will affect the outcome of the lawsuit.  *Anderson v. Liberty Lobby*, 477 U.S. 242,

248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the

nonmoving party:

> When a motion for summary judgment is made and supported as
> provided in this rule, an adverse party may not rest upon the mere
> allegations or denials of the adverse party's pleading, but the
> adverse party's response, by affidavits or as otherwise provided in
> this rule, must set forth specific facts showing that there is a
> genuine issue for trial.  If the adverse party does not so respond,
> summary judgment, if appropriate, shall be entered against the
> adverse party.

Fed. R. Civ. P. 56(e).  The court must afford all reasonable inferences and construe the

evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dep't. of*

*Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 255); *see also United*

*States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Summary judgment is appropriate when a party who bears the burden of proof at trial

6

fails to make a showing sufficient to establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). When the non-moving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252). Moreover, if the evidence is "merely colorable" or is not "significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990); *see also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc.*, 9 F.3d 561 (7th Cir. 1993); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n. 7 (5th Cir.) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment …."), *cert. denied*, 506 U.S. 832, 121 L. Ed. 2d 59, 113 S. Ct. 98 (1992). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, upon only those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### DISCUSSION

**A.      Trade Secret Claims - Counts One and Four**

Plaintiffs allege that defendants have misappropriated and threatened to

misappropriate their trade secrets.  During discovery, plaintiffs disclosed that they believe

Fargnoli has misappropriated the following:  plaintiffs' quality control procedures, the

identity of plaintiffs' customers, competitors, producers, distributors and suppliers, pricing

and other product information including "aggregate reports, test results, [and] job mix

formulas."

A complainant in a civil action is entitled to recover damages for trade secret

misappropriation.  Ohio Rev. Code § 1333.63(A).  "Trade secret" means:

> information, including the whole or any portion or phase of any
> scientific or technical information, design, process, procedure,
> formula, pattern, compilation, program, device, method,
> technique, or improvement, or any business information or plans,
> financial information, or listing of names, addresses, or telephone
> numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential,
> from not being generally known to, and not being readily
> ascertainable by proper means by, other persons who can obtain
> economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

Ohio Rev. Code § 1333.61(D).  "Misappropriation" means any of the following:

> (1) Acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means;
>
> (2) Disclosure or use of a trade secret of another without the
> express or implied consent of the other person by a person who
> did any of the following:

> > (a) Used improper means to acquire knowledge of the trade secret;
> >
> > (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
> >
> > (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code § 1333.61(B).

Defendants argue that plaintiffs cannot establish that the alleged trade secrets are "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy." Ohio Rev. Code § 1333.61(D)(2).  Plaintiffs' only evidence comes from an affidavit submitted by their General Counsel Jeffrey Higerd.  Higerd states that plaintiffs' business information is, "as a body of information, not known outside the Company."  He also states that he has "personally witnessed Unique employees, including Mr. Fargnoli, being orally admonished and advised by [the founder and president of the company] to maintain what they learn and hear at our sales and planning meetings and in product mixes and formulations and from our quality control and technical people and in their work for the company as private and confidential as the Company's viability depends on this protection."

This is in contrast to defendants' evidence that plaintiffs do not maintain the secrecy of its customer lists, pricing or cold patch ingredients.  Defendants point to evidence that many of plaintiffs' customers are listed on their website.  The components of plaintiffs' cold patch are also listed on their website.  Defendants also point out that plaintiffs have no

confidentiality agreements with their customers.  As a result, the customers are free to

disclose the price they pay for plaintiffs' product.  Given these facts, plaintiffs cannot prove

that their information is not "readily ascertainable by proper means" by others or that this

information has been the "subject of efforts that are reasonable under the circumstances to

maintain its secrecy."  *See R&R Plastics, Inc. v. F.E. Meyers Co.*, 637 N.E.2d 332 (Ohio Ct.

App. 1993) (information is not a trade secret if it is disclosed to plaintiff's customers).

Plaintiffs have also failed to adduce any evidence that Fargnoli has disclosed or

threatened to disclose any of these alleged trade secrets.  Fargnoli was employed by the

predecessor to Lafarge for almost a decade.  He declares that he gained knowledge of the

QPR product during that time and that he has never known the formula for plaintiffs' anti-

stripping additive (the only technical trade secret at issue).  There is no evidence to the

contrary.  The same is true of plaintiffs' alleged business trade secrets.  Plaintiffs point the

Court to no specific evidence that Fargnoli has disclosed or is likely to disclose any

confidential customer information.  Moreover, there is evidence that defendants' cold patch

formula and quality control procedures were in place before Fargnoli began working there in

2007 and that they remain unchanged.  In addition, plaintiffs' president Michael Pemberton

testified at deposition that he has no evidence that Fargnoli has disclosed any of plaintiffs'

alleged trade secrets.  The evidence demonstrates that any disclosure of plaintiffs' pricing

information to Lafarge was made by Don Nathan.

The affidavit of plaintiffs' sales representative Michael Ball does not require a

different conclusion.  He states that

> In 2007, Tony Fargnoli worked in collaboration with H&K
> Materials' sales force, a former Unique customer, to carry out

10

> what they called a QPR "Pennsylvania Sales Blitz" against Unique
> customers and producers in Pennsylvania. ... Part of this QPR
> "Pennsylvania Sales Blitz" involved the use of prior knowledge of
> UPM costs, pricing and margins, which allowed the H&K
> companies, now as Unique's competitors, to low-ball prices and
> to know they would likely be successful as they now knew
> Unique's costs, and its local producers' costs.

This testimony is not credible evidence because it lacks foundation.  Plaintiffs provide no

evidence that this Sales Blitz "involved the use of prior knowledge of UPM costs, pricing and

margins."  Similarly, Mr. Ball's testimony that "Tony Fargnoli has sold a substantial amount

of QPR product to asphalt cold patch producers in New York since February 2007" cannot

establish that trade secrets were disclosed.  Plaintiffs simply assert in conclusory fashion that

Fargnoli must have disclosed pricing information simply because Lafarge has offered bids to

some of Unique's customers.  These assertions cannot substitute for credible evidence.

Plaintiffs next argue that Fargnoli will *inevitably* disclose their trade secrets.  Under

Ohio law, threatened misappropriation is actionable.  Ohio Rev. Code § 1333.62(A)

(injunctive relief available).  "According to the inevitable-disclosure rule, a threat of harm

warranting injunctive relief can be shown by facts establishing that an employee with detailed

and comprehensive knowledge of an employer's trade secrets and confidential information

has begun employment with a competitor of the former employer in a position that is

substantially similar to the position held during the former employment."  *Procter & Gamble*

*v. Stoneham*, 747 N.E.2d 268, 279 (Ohio App. 2000) (analyzing a non-compete).  However,

"simply stating that inappropriate use of the information is inevitable is not sufficient."

*Prosonic Corp. v. Stafford*, 539 F. Supp. 2d 999, 1005 (S.D. Ohio 2008); *see also*

*Extracorporeal Alliance, L.L.C. v. Rosteck*, 285 F. Supp. 2d 1028, 1042 (N.D. Ohio 2003)

11

(Wells, J.) (no evidence that former employee threatened to disclose trade secrets).

Plaintiffs assert that "the only conclusion to be drawn [from the fact that "Fargnoli spent 6 years at Unique learning all of Unique's business and customer information"] is that Fargnoli has had to use this experience, knowledge and information at Lafarge Division or he could not function."  This argument is unavailing for the simple reason that plaintiffs adduce no evidence in support of it.

The Court grants summary judgment to defendants on Counts One and Four.

## B.    Other Tort and Unfair Competition Claims - Count Three

Count Three alleges conversion, misappropriation of trade secrets, tortious interference and unfair competition against all defendants.

Defendants argue each of these claims are preempted by Ohio's Uniform Trade Secrets Act because they each are "based on" defendants' alleged misappropriation of plaintiffs' trade secrets.

> (A) Except as provided in division (B) of this section, sections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.
>
> (B) Sections 1333.61 to 1333.69 of the Revised Code do not affect any of the following:
>
> (1) Contractual remedies, whether or not based on misappropriation of a trade secret;
>
> (2) Other civil remedies that are not based on misappropriation of a trade secret;
>
> (3) Criminal remedies, including those in other sections of this chapter, whether or not based on misappropriation of a trade secret.

Ohio Rev. Code § 1333.67.

To the extent that plaintiffs' claims are based on a theory of trade secret

misappropriation, they are clearly preempted by the plain language of the statute.  Plaintiffs,

however, argue that their tort and unfair competition claims arise rather under Ohio's

deceptive trade practices act, Ohio Rev. Code § 4165.02.  This charge arises out of Fargnoli's

alleged "palming off" of UPM cold patch as QPR's product and his alleged threats to "run a

Unique producer [Keystone Paving in Pennsylvania] out of business if he does not switch to

QPR."

Plaintiffs again rely on the affidavit of their sales representative Michael Ball.  Mr.

Ball's affidavit states that he witnessed this alleged "palming  off" on August 13, 2008, two

months after discovery closed in this case.  Plaintiffs also rely on the deposition testimony of

the owner of Keystone Paving in Pennsylvania, Mr. Cloyd Sones.  He testified at deposition

that Fargnoli asked him to "deliver QPR and tell the people it's UPM."  He also testified that

Fargnoli threatened to send a dozen Lafarge sales representatives to Pennsylvania to run

Keystone out of business if Sones did not purchase QPR over UPM.

Plaintiffs did not move for leave to amend their complaint to add these factual and

legal assertions.  Nor did plaintiffs inform defendants of the new evidence and charges against

them.  Plaintiffs revealed this evidence and theory of liability for the first time in opposition

to defendants' motion for summary judgment.  While plaintiffs are free to institute a suit to

recover for these alleged wrongs that are not based on trade secret misappropriation, their

efforts in this case come too late.[1]

---

[1]

Plaintiffs move for leave to file a surreply on the ground that an

Given the undue prejudice that would result in allowing these new allegations to be pursued at this late stage, the Court grants summary judgment to defendants on Count Three.

## C.        Breach of Contract Claims - Counts Two and Five

Plaintiffs allege three instances of competition in violation of the Employment Agreement:  Fargnoli's dealings with Albany Asphalt in New York, H&K in Pennsylvania and Kokosing in Ohio.

"[A] covenant not to compete which imposes unreasonable restrictions upon an employee will be enforced to the extent necessary to protect the employer's legitimate interests.  A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.  Courts are empowered to modify or amend employment agreements to achieve such results." *Raimonde v. Van Vlerah*, 325 N.E.2d 544, 547 (Ohio 1975).  Plaintiffs must prove each element by clear and convincing evidence.  *Chi. Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 991 (6th Cir. 2007).

The rule of reasonableness "permits courts to fashion a contract reasonable between

------

affidavit submitted by defendants in support of their reply brief contained "materially false statements regarding the misrepresentation of Plaintiffs' UPM product and Defendants' QPR product in the marketplace in Pennsylvania where "QPR" was wrongfully labeled ... as "DOT UPM" in signage at the site where cold patch material is sold."  Given the tardiness of this new claim, it is irrelevant whether or not "Plaintiffs' Pennsylvania representative who witnesses these matters will refute the false and misleading statements" in the affidavit.  The Court also notes that plaintiffs failed to submit the proposed surreply with their motion for leave.  The motion for leave is denied.

14

the parties, in accord with their intention at the time of contracting, and enables them to

evaluate all the factors comprising 'reasonableness' in the context of employee covenants."

*Raimonde*, 325 N.E.2d at 547.  Among the factors properly to be considered are:

> the absence or presence of limitations as to time and space, ...
> whether the employee represents the sole contact with the
> customer; whether the employee is possessed with confidential
> information or trade secrets; whether the covenant seeks to
> eliminate competition which would be unfair to the employer or
> merely seeks to eliminate ordinary competition; whether the
> covenant seeks to stifle the inherent skill and experience of the
> employee; whether the benefit to the employer is disproportional
> to the detriment to the employee; whether the covenant operates
> as a bar to the employee's sole means of support; whether the
> employee's talent which the employer seeks to suppress was
> actually developed during the period of employment; and whether
> the forbidden employment is merely incidental to the main
> employment.

*Id.* (internal quotations omitted).  The enforceability of a covenant not to compete is a

question of law for the Court to decide.  *Chicago Title*, 487 F.3d at 990.

Covenants not to compete may only restrain *unfair* competition.  A former employer

has no legitimate interest in preventing ordinary competition such as that it would face from

its competitors in the regular course of business.  *BDO Seidman v. Hirshberg*, 712 N.E.2d

1220, 1224 (N.Y. App. 1999) (applying New York law which employs same 3-part test as

Ohio).

Defendants argue that the non-compete provision in the Employment Agreement is

unenforceable as to Pennsylvania because that territory is not listed in the Agreement.  They

argue that the non-compete is unenforceable in Ohio because Fargnoli's sales territory never

included Ohio while employed at Unique.  Defendants also assert that the non-disclosure

provision, preventing Fargnoli from disclosing confidential information, is sufficient to fully

15

protect plaintiffs; thus, the non-compete provision is greater than necessary to protect

plaintiffs and, as a result, unenforceable.  They also argue that because Fargnoli serviced

Albany Asphalt as a customer in New York while employed by Lafarge's predecessor,

plaintiffs have no protectable interest in this customer relationship.  Plaintiffs argue that the

non-compete provisions must be enforced to protect their trade secrets and the efforts they put

into their customer relationships.

　　　The Court agrees with defendants that the Employment Agreement does not preclude

Fargnoli from competing in Pennsylvania.  The Agreement does not purport to cover

Pennsylvania.  The Agreement by its own terms must be modified in writing.  All parties

agree that the Agreement was never modified to add Pennsylvania as part of Fargnoli's

territory and part of the region in which he agreed not to compete.  Accordingly, Fargnoli's

alleged solicitation of Keystone Paving and others in Pennsylvania is irrelevant to whether or

not the Employment Agreement has been breached.  The evidence that Fargnoli treated

several of Unique's Pennsylvania customers to lunch in the weeks after he left Unique's

employ is also irrelevant.  While defendants' actions in Pennsylvania may have caused harm

to plaintiffs in that some customers now purchase from Lafarge, such actions are in the form

of ordinary competition and are not actionable absent some contractual prohibition against

Fargnoli acting in that territory.  Such a prohibition is absent from the Employment

Agreement.

　　　The Court finds that the Employment Agreement is also unenforceable as to

Fargnoli's activities in Ohio.  He was never employed by Unique to solicit or maintain

business in Ohio.  The fact that Fargnoli "collaborated" with Unique's service provider PLM

is insufficient to establish that the non-compete is reasonable as to Ohio.  Attorney Higard's

statement that "everyone is expected to assist with business in Ohio" because "the Company

is located in Ohio and does business in Ohio" is also insufficient.  The provision in the non-

compete preventing Fargnoli from working in Ohio when Unique never employed him in that

territory is greater than necessary to protect Unique's legitimate interests in that territory and

is unreasonable.  *See Nat'l Interst. Ins. Co. v. Perro*, 934 F.Supp. 883 (N.D. Ohio 1996)

(O'Malley, J.) (non-compete too broad where defendant did not sell in the proscribed

territory).

On the other hand, nobody disputes that the non-compete is enforceable in New York.

However, plaintiffs fail to demonstrate that Fargnoli has been engaging in any sales activities

in that region.  The fact that Albany Asphalt is now a customer of Lafarge is not enough on its

own to show that Fargnoli solicited this customer in violation of the non-compete provision of

the Employment Agreement.  Moreover, Ohio courts have been reluctant to enforce non-

competes where a non-disclosure provision is also in place.  *Am. Bldg. Servs., Inc. v. Cohen*,

603 N.E.2d 432 (Ohio Ct. App. 1992) (non-compete was unreasonable where employee had

worked previously in the same industry especially considering the contract between the

parties prevented employee from disclosing confidential information); *see also BDO*, 712

N.E.2d at 1224 (covenant in restriction of accountant soliciting clients of former employer

greater than necessary to protect legitimate interest of former employer where there was no

evidence that employee actually used any confidential information to solicit those clients;

and, he had brought many of those clients with him to the former employer in the first

instance).

17

The Court grants summary judgment to defendants on Counts Two and Five.

**D.      Tortious Interference - Count Six**

Plaintiffs argue that defendants have tortiously interfered with Fargnoli's performance under the Employment Agreement.  Defendants argue that there can be no tortious interference because there was no breach of a valid, enforceable agreement.

In Ohio, the elements of a claim for tortious interference with contract are: (1) the existence of a contract; (2) the wrongdoer's knowledge of the contract; (3) the wrongdoer's intentional procurement of the contract's breach; (4) a lack of justification; and (5) resulting damages.  *E.g., Fred Siegel Co., LPA v. Arter & Hadden*, 707 N.E.2d 853 (1999).

The Court agrees that plaintiffs' claim must fail given their inability to prove breach of the Employment Agreement.        The Court grants summary judgment to defendants on Count Six.

### CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment is GRANTED and plaintiffs' Move for Leave to file a Surreply is DENIED.

IT IS SO ORDERED.


　　　　　　　　　　　　　　　　　　 /s/Patricia A. Gaughan
                                    PATRICIA A. GAUGHAN
                                    United States District Judge

Date   10/31/08

18